UNITED STATES of America, Plaintiff,

v.

HOPKINS DODGE SALES, INC. and Gary E. Mattox, Defendants.

UNITED STATES of America, Plaintiff,

v.

FREEWAY DODGE, INC. and Thane D. Hawkins, Defendants.

Nos. Civ. 3–85–1859, Civ. 3–85–1954.

United States District Court,
D. Minnesota,
Third Division.

June 15, 1987.

Mary E. Carlson, Asst. U.S. Atty., Minneapolis, Minn., David Levitt and Sharon Kurn, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Mark E. Jacobson, Poindexter Jacobson Stromme & Harwood, Minneapolis, Minn., James S. Simonson, Gray Plant Mooty Mooty & Bennett, Minneapolis, Minn., for defendants.

## ORDER

DEVITT, District Judge.

The above-entitled matters came on for trial before the undersigned, without a jury, on May 26 and 27, 1987. David Levitt and Sharon Kurn of the United States Department of Justice appeared on behalf of the plaintiff in both actions. Mark E. Jacobson of Poindexter Jacobson Stromme & Harwood, P.A., and James S. Simonson of Gray, Plant, Mooty, Mooty & Bennett, P.A., appeared on behalf of the defendants in both actions.

On the basis of the oral testimony, the documents received in evidence, and the arguments of counsel, the court is fully advised in the premises and hereby makes the following:

## FINDINGS OF FACT

Plaintiff United States of America brings this action on behalf of the Federal Trade Commission (FTC). The defendant corporations, Freeway Dodge, Inc. (Freeway) and Hopkins Dodge, Inc. (Hopkins), are both incorporated under the laws of the State of Minnesota and have their principal places of business there. Freeway is engaged in the sales of new and used vehicles. Hopkins was engaged in the sales of new and used motor vehicles until October 1986, at which time the tangible assets of the dealership were sold.

The defendant individuals, Mattox and Hawkins, are both citizens of Minnesota. Mattox, who has been in the automobile business since 1970, is the owner and president of Hopkins and, at all times relevant to these actions, was principally responsible for the overall management of Hopkins. He also owned Burnsville Nissan (May 1985 to late 1986) and owns Universal Ford/Toyota (September 1986 to present). Hawkins, who has been in the automobile business since 1969, owns over 95% of Freeway and is its president. Although Mattox and Hawkins co-owned Freeway until October 1985, Hawkins has been principally responsible for the overall management of Freeway since June 1984. He also owns Thane Hawkins Polar Chevrolet, Inc. (April 1985 to present).

The Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, which has been in force and effect at all times during the relevant period, regulates, among other things, the advertising of consumer credit. Title 12 C.F.R. Part 226, commonly known as Regulation Z, was promulgated pursuant to Section 105 of the TILA, 15 U.S.C. § 1604, and has regulated consumer credit advertising at all times during the relevant period.

The FTC has engaged in a program of monitoring advertisements for compliance with TILA and Regulation Z since 1982 and uses an escalating series of letters as its standard enforcement tool. Aware that twelve of Hopkins' advertisements in the preceding ten months violated Regulation Z, the FTC informed Hopkins by letter in February 1983 that a January 16, 1983, advertisement violated Regulation Z. The mailing to Hopkins included a copy of the staff manual, "How to Advertise Consumer Credit," which explained the requirements of Regulation Z and provided a telephone number of a staff person to contact for further information. Aware that nine of Freeway's advertisements in the preceeding four months similarly violated Regulation Z, the FTC also informed Freeway by letter in February 1983 that a January 16, 1983, advertisement violated Regulation Z and gave the phone number of an FTC staff person to contact for further information. The mailing to Freeway included the staff manual, "How to Advertise Consumer Credit," as well as a copy of TILA and Regulation Z. No one at Hopkins or Freeway recalls receiving or seeing these mailings.

After observing 17 further violations by Hopkins, the FTC informed Hopkins by certified mail in April 1983 that Hopkins' March 20 ad violated Regulation Z. Twenty-six violations later, the FTC informed Hopkins by certified mail in October 1983 that Hopkins' October 16 ad violated Regulation Z. The October 1983 mailing included the staff manual as well as a copy of TILA, Regulation Z and a staff person's telephone number. While no one at Hopkins recalls seeing these mailings, the FTC staff person whose number was included in the October mailing received a phone call from Hopkins' general manager, Tom Palme. Mr. Palme also wrote to the FTC in response to the October 1986 mailing. Three months and three violations later, the FTC informed Hopkins by certified mail that the FTC Act provided for civil penalties for violations of Regulation Z. In September 1984, eights months and seventy-seven violations later, the FTC informed Hopkins by certified mail that it was about to institute civil proceedings against Hopkins. This is the only mailing Hopkins recalls seeing.

Meanwhile, the FTC had been corresponding with Freeway about its ongoing violations since the time of the February 1983 letter. In October 1983, after six further violations, the FTC informed Freeway by certified mail that its October 15 ad violated Regulation Z. The mailing included a copy of the staff manual, Regulation Z, a copy of the February 1983 letter to Freeway, and a staff person's phone number for further information. In November 1983, five violations later, the FTC informed Freeway that its November 5 and 6 ads violated TILA, referred to the staff manual, and provided a staff person's phone number who could answer questions or provide further advice. The mailing also included a copy of the October 1983 letter to Freeway. In January 1984, seven violations later, the FTC informed Freeway by certified mail that the FTC Act provided for civil penalties for violations of Regulation Z. In September 1984, eight months and fifty-seven violations later, the FTC informed Freeway by certified mail that it was about to institute civil proceedings against Freeway. This is the only mailing Freeway recalls receiving, also.

Following the receipt by Hopkins and Freeway of the FTC's September 1983 letters regarding litigation, Mattox and his counsel met with the FTC to discuss the compliance problems of Hopkins and Freeway. Mattox reported back to Hawkins on the results of the meeting with FTC. Mattox and Hawkins subsequently spoke with the managers of Hopkins and Freeway, respectively, about FTC compliance problems including the requirements of TILA and Regulation Z and the substance of letters sent to the dealerships by the FTC. They also asked their respective ad agencies and the newspapers to monitor their ads for compliance.

These procedures have proven to be ineffective, however. Hopkins ran seventeen subsequent violative ads via newspaper, radio, television, and showroom display between the October 1984 meeting with the FTC and the sale of its tangible assets in October 1986. Freeway ran seven violative ads via newspaper and television in January and March of 1987. These compliance-related procedures were also implemented by Mattox and Hawkins at the other dealerships they owned. While the FTC has not reported any recent violative ads for Polar Chevrolet (owned by Hawkins since April 1985), violations by Burnsville Nissan and Universal (both owned by Mattox) have been reported. The FTC reported one violative ad for Burnsville Nissan during the approximately fifteen months that Mattox owned it in 1985–86 and nine violative ads for Universal in December 1986.

The procedures established by Mattox and Hawkins to effect compliance with the law were insufficient. The managers for the dealerships were not adequately familiar with the requirements of Regulation Z. Indeed, Mattox himself, who met with the FTC in Washington, D.C., admitted that he was not familiar with the intricacies of Regulation Z. He testified that it was very difficult to avoid running violative ads because of the time pressures of business and the inexperience of dealership management.

The assistance in compliance monitoring which defendants sought from their ad agencies and newspapers was of little help. The ad agency personnel were inadequately familiar with the requirements of Regulation Z. The ad agent for Freeway delegated the monitoring task to his subordinate without even reading Regulation Z. An attorney hired by Freeway in connection with this action testified that he was familiar with Regulation Z, yet he advised Freeway's ad agency, after reviewing a television ad receipt, that a particular ad was proper when, in fact, it violated Regulation Z. Hopkins' ad agent testified that he usually had only two days lead time to prepare copy and that Mattox appeared to be in and out of Hopkins' office when he would stop by to drop off the ad copy for Mattox's preview. In one case, Mattox admitted he allowed no time to preview an ad. Nor were the newspapers adequately familiar with Regulation Z so as to catch violations. In fact, according to Mattox, some violative ads were the result of a newspaper failing to follow instructions on ad changes from day to day.

All of the steps taken by defendants have been ineffective in preventing violations of TILA and Regulation Z. Additional measures, including written guidelines prepared by defendants in April 1987, have not been in place long enough to judge their effectiveness.

## CONCLUSIONS OF LAW

This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 15 U.S.C. § 53(b).

■ Under the circumstances outlined above, this is a proper case for a permanent injunction under 15 U.S.C. § 53(b) because, even though defendants have altered some of their violative conduct, there is a cognizable danger of recurrent violations. *SEC v. First Amer. Bank and Trust Co.*, 481 F.2d 673, 681–82 (8th Cir. 1973); *FTC v. Kitco of Nevada*, 612 F.Supp. 1282, 1296 (D.Minn.1985). Because defendants' minimal measures for ensuring compliance have failed to prevent violations, thus making defendants' promises of future compliance undependable, a permanent injunction is required in order to accomplish the objectives of TILA and Regulation Z, *Brennan v. Correa*, 513 F.2d 161, 163–64 (8th Cir.1975), particularly where, as here, the constant policing by the FTC has proven to be unsuccessful in preventing violations, *Marshall v. Lane Processors, Inc.*, 606 F.2d 518, 520 (8th Cir. 1979). The absence of current violations does not rebut the inference, from past violations, that future violations are reasonably likely. *First Amer. Bank, Id.* Moreover, "[i]t is the duty of the courts to be aware of efforts to defeat injunctive relief by protestations of repentence and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Medical Soc'y*, 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952).

■ Hopkins' present business status, while tentative, does not make an injunction against Hopkins inappropriate. *Cf. Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1221 n. 4 (7th Cir. 1979). An injunction against Mattox and Hawkins is appropriate because they were in a position of high authority in their dealerships, had responsibility for the overall management of their dealerships, were informed of the violative ads, and failed to take sufficient steps to prevent continued violations. *United States v. Johnson*, 541 F.2d 710, 712–13 (8th Cir.1976) *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1106, 51 L.Ed.2d 539 (1977); *Kitco*, 612 F.Supp. at 1293.

Based upon these findings and conclusions,

IT IS ORDERED that:

Defendants are permanently enjoined from violating Regulation Z, 12 C.F.R. Part 226, or any provision of the Truth-in-Lending Act, 15 U.S.C. §§ 1601–1667e, as amended.